UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___8/22/22___
```

-------------------------------------------------------- x
:
FELIX CRUZ,                                              :
:
Plaintiff,                         :
:
-against-                              :          1:21-CV-03083 (ALC)
:
:          OPINION AND ORDER
KILOLO KIJAKAZI,                                         :
COMMISSIONER OF SOCIAL SECURITY,                        :
:
Defendant.                         :
-------------------------------------------------------- x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Felix Cruz brings this action challenging the Commissioner of Social Security's

final decision ("Commissioner" or "Defendant") that Cruz was not entitled to Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). Both parties

have cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. Rule 12(c). ECF

Nos. 15, 17. For the reasons set forth below, Plaintiff's motion is **DENIED** and Defendant's

motion is **GRANTED**.

## BACKGROUND

I.      **Procedural History**

On April 27, 2018, Plaintiff filed an application for disability insurance benefits in

connection with a disability allegedly beginning on January 31, 2002.[1] Certified Administrative

---

[1] For Social Security Disability Insurance ("SSDI") claims, a claimant can receive disability benefits only for the period of time from the date of alleged onset to the date last insured. 20 C.F.R. § 404.316. A claimant cannot receive SSDI benefits while confined in prison or jail for conviction of a felony. § 404.468. Plaintiff's date last insured is December 31, 2006. R. at 19. Because Plaintiff was in prison for the conviction of a felony for the period between the date of alleged onset and the date last insured, he does not qualify for SSDI benefits. *See Zipkin v. Heckler*, 790 F.2d 16 (2d Cir. 1986).

Record ("R.") at 226. On April 30, 2018, Plaintiff protectively filed an application for SSI.[2] *Id.*

The Social Security Administration ("SSA") denied Plaintiff's claims on August 10, 2018. R. at

114. Plaintiff then filed a written request for a hearing before an Administrative Law Judge

("ALJ") on January 18, 2019. R. at 122.

ALJ Anne Sharrard held a video hearing on November 12, 2019. R. at 18. Plaintiff

appeared and testified from New York, NY. *Id.* He was represented by his attorneys, Daniel

Berger and Jacques Farhi. Mr. Farhi and Vocational Expert ("VE") Lisa Gagliano also appeared

at the hearing. *Id.*

On March 12, 2020, the ALJ issued a decision denying Plaintiff's claim, finding that

Plaintiff is not disabled under sections 216(1), 223(d), and 1614(a)(3)(A) of the Social Security

Act. R. at 12. Plaintiff filed an appeal of the ALJ's decision to the SSA Appeals Council. R. at

328. His request for an appeal was denied on February 17, 2021, rendering the ALJ's decision

the final decision of the Commissioner of Social Security. R. at 1.

Plaintiff filed this civil action on April 9, 2021. ECF No. 1. Plaintiff moved for judgment

on the pleadings on October 29, 2021 pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure and submitted a memorandum of law in support of his motion ("Pl. Mot."). ECF No.

15-16. On December 27, 2021, Defendant cross-moved for judgment on the pleadings and

submitted a memorandum of law in support of his motion and in opposition to Plaintiff's motion

for judgment on the pleadings ("Def. Opp."). ECF No. 17-18. On January 19, 2022, Plaintiff

---

[2] For SSI claims, a claimant may not receive benefits while residing in a public institution, which is defined as an institution operated or controlled by federal government, state government, or a political subdivision of a state. 20 C.F.R. §§ 416.211(a), 416.201. Publicly operated community residences with 16 or fewer residents do not qualify as public institutions. § 416.211(c). From Plaintiff's release from prison on June 5, 2018 to the ALJ's decision on March 12, 2020, Plaintiff resided in Good Samaritan transitional housing. Because Good Samaritan is a New York Department of Homeless Services provider with more than 16 residents, Plaintiff would not qualify for benefits for that period of time.

submitted a reply memorandum of law in support of his motion ("Pl. Reply"). ECF No. 19. The Court now considers the parties' motions.

## II.    Medical Evidence

Plaintiff was incarcerated for the 16-year period from the date of alleged onset, January 31, 2002, to June 5, 2018. R. at 628-29. During this period, Plaintiff's alleged disabilities included Major Depressive Disorder, Borderline Personality Disorder, Polysubstance Dependence, Asthma, Diabetes, Hypertension, unspecified Dorsalgia, and unspecified hearing loss. R. at 629, 476, 630. Plaintiff received treatment during and after his incarceration.

On January 31, 2002, Plaintiff was evaluated at Bellevue Hospital to determine his fitness to proceed with legal proceedings in connection with his arrest. R. at 498. At the evaluation, Plaintiff reported auditory hallucinations and a history of depressive symptoms. R. at 488. Plaintiff was diagnosed with personality disorder NOS and polysubstance dependence. R. at 489. The examiner determined that Plaintiff was psychiatrically stable, but should receive psychiatric monitoring to re-evaluate his need for medications. *Id*. There is no evidence in the record of mental health treatment or psychiatric medications prior to his arrest. The examiner also noted that Plaintiff did not have any physical problems and that his physical assessment was unremarkable. *Id*.

Plaintiff attended the Alcohol and Substance Abuse Treatment Program in prison from April 2003 to August 2003, and again from January 2011 to November 2011. R. at 630.

On January 15, 2004, Plaintiff had an initial assessment at the Central New York Psychiatric Center in prison. R. at 530. Plaintiff reported a significant decrease in his symptoms of depression, including auditory hallucinations. *Id*. At the time, he was taking Zoloft, Seroquel, and Vistaril as prescribed. R. at 541. Plaintiff reported that he was getting along well with other

inmates and officers. R. at 530. The examiner noted that his appearance, behavior, mood, and thought patterns were all within a normal range. *Id*.

Plaintiff continued treatment at Central NY Psychiatric Center and remained stable until early 2005 when he reported an increase in depressive symptoms. R. at 334. In July 2005, Plaintiff was admitted to the Residential Crisis Treatment Program ("RCTP") due to complaints of auditory hallucinations telling him to hurt himself and others. R. at 629. There is no medical evidence of record from July 2005 to December 2006.

From April 2007 until his release from prison in June 2018, Plaintiff continued to receive mental health treatment from a variety of counselors at Central NY Psychiatric Center for Major Depressive Disorder with psychotic features and Borderline Personality Disorder. In April 2007, Plaintiff was admitted to the RCTP again after self-inflicting cigarette burns to his arms. R. at 337. Plaintiff reported that he did so in response to auditory hallucinations. *Id*. Plaintiff's therapist noted that Plaintiff denied further impulses for self-harm and was cooperative during their interview. *Id*. The therapist also noted that Plaintiff's only complaint that day was that others "did not understand his hearing impairment," claiming that he was deaf in his left ear. This is the first mention of such a hearing impairment on the record, and there is no objective medical evidence of diagnosed hearing loss. *Id*.

Plaintiff remained stable, only occasionally reporting auditory hallucinations, until February 2012 when he began refusing his medication due to fears of negative side effects. R. at 362. Shortly after, Plaintiff attempted suicide and was admitted to the RCTP for two months. R. at  484. Upon discharge, Plaintiff reported that he was "feeling really good" and attributed it to taking his medications again. R. at  474. Since then, Plaintiff has not reported any hallucinations or ideations of suicide or self-harm. R. at 629.

From 2012 to his 2018 release, Plaintiff remained stable and reported that his medications were controlling his symptoms well. R. at 619. In January 2018, he reported that he was getting along well with others in general population and was taking part in programs like paint shop and GED courses. *Id*. Progress notes from 2017 to his 2018 release show that Plaintiff's therapist noticed a marked improvement in Plaintiff's mental status with consistent findings of normal appearance, thought process, mood, affect, insight, and judgment. R. at 593-622. On March 15, 2018, Plaintiff was transferred to the Community Oriented Re-Entry Program ("CORP"). R. at 626.

On April 23, 2018, Dr. Dora Gutierrez, psychiatrist at CORP, provided that Plaintiff's diagnosis of Major Depressive Disorder was in partial remission. R. at 628. She reported that Plaintiff is respectful, he participates well in group therapy, and his concentration and persistence are normal. R. at 630. She also noted that Plaintiff reported independent hygiene, travel, cooking, cleaning, and shopping skills. *Id*. Dr. Gutierrez noted, however, that Plaintiff may decompensate and become psychiatrically unstable upon release into the community where less support would be available. *Id*. She indicated that the destructiveness of his substance abuse in particular may be an obstacle to maintaining gainful employment. R. at 631.

On June 6, 2018, after Plaintiff was released from prison and moved to Project Renewal transitional housing, Dr. Arthur Middleton from Project Renewal conducted an initial psychiatric evaluation. R. at 668. Dr. Middleton noted that Plaintiff was pleasant and cooperative, and reported feeling "happy" since his release. R. at 670. Dr. Middleton reported that Plaintiff showed normal speech, behavior, affect, thought process, insight, judgment, and impulse control. R. at 671.

From June 6, 2018 to August 21, 2019, Plaintiff received consistent treatment from primary care physicians at Project Renewal, including Dr. Terry Kaplan. R. at 685-730. Treatment notes show that Plaintiff remained stable, reported no symptoms during depression screenings, and was managing his medications for his physical conditions well.

On June 27, 2018, Plaintiff had a consultative psychiatric examination with Dr. Arlene Broska. R. at 642. Dr. Broska conducted an extensive mental status examination and determined that Plaintiff did not have any limitations in understanding, remembering, or applying directions and instructions; using reason to make work-related decisions; interacting with supervisors, coworkers, and the public; sustaining concentration and performing a task at a consistent pace; or sustaining an ordinary routine and regular attendance at work. R. at 644. Dr. Broska found evidence of moderate limitations in regulating emotions, controlling behavior, and maintaining well-being. *Id*. Dr. Broska noted that Plaintiff reported feeling significantly better with medication and that he sleeps and eats well while taking it. R. at 642. Dr. Broska concluded that the results of the mental status examination were adequate to Plaintiff's history and experience and did not appear to interfere with his functional capabilities. R. at 643.

On June 27, 2018, Dr. John Fkiaras conducted a consultative internal medicine examination. R. at 646. Dr. Fkiaras noted that Plaintiff showed no signs of scoliosis or abnormalities in the thoracic spine and showed full range of motion in the cervical spine, lumbar spine, and shoulders. R. at 649. His report includes records of an x-ray taken on June 29, 2018 showing no abnormalities in the lumbosacral spine. R. at 651. Dr. Fkiaras determined that Plaintiff should avoid respiratory irritants and that Plaintiff has mild to moderate limitations for repetitive squatting, heavy lifting, carrying, pushing, and pulling. R. at 650.

On August 9, 2018, SSA medical consultant Dr. H. Miller reported that Plaintiff did not have any physical limitations but should avoid even moderate exposure to respiratory irritants. R. at 97. The same day, SSA psychological consultant Dr. C. Walker found that Plaintiff's impairments result in more than minimal functional limitations but Plaintiff retains the ability to understand and remember simple instructions; maintain adequate attention and concentration in work-like settings; sustain a routine; and relate and respond to others in an appropriate manner. R. at 100. Dr. Walker noted that Plaintiff has some difficulty with adaptation but concluded that it is insufficient to significantly limit his ability to adapt to changes or make decisions. *Id*.

On April 4, 2019, Dr. Erin Halligan-McCaleb, Plaintiff's treating psychiatrist at New Beginnings (provided by Project Renewal), completed a medical source statement reporting that Plaintiff's impairments affected his ability to understand, remember, and carry out instructions, as well as his ability to respond appropriately to supervision in a work-setting. R. at 677. Dr. Halligan-McCaleb also noted that Plaintiff had a moderate limitation in activities of daily living; a marked limitation in maintaining social functioning; frequent deficiencies of concentration, persistence, or pace; and repeated episodes of deterioration or decompensation in work or work-like settings. R. at 678.

On May 8, 2019, Dr. Kaplan, Plaintiff's treating physician at Project Renewal, completed a medical source statement stating that Plaintiff had diagnoses of scoliosis, Type II diabetes, hypertension, borderline personality disorder, hearing loss, and asthma. R. at 679. Dr. Kaplan determined that during an 8 hour work day, Plaintiff could sit for a maximum of one hour and stand or walk about for a maximum of two hours. R. at 680-81. Dr. Kaplan also determined that Plaintiff could carry up to 10 lbs. frequently and 11 to 20 lbs. occasionally but could never exceed that. R. at 682. Dr. Kaplan stated that Plaintiff could never balance, stoop, or make

certain neck movements. *Id*. He also noted that Plaintiff's impairments would likely cause him to be absent from work about three times per month. R. at 684.

### III.     Plaintiff's Testimony

Plaintiff was born on February 6, 1975 and was 44 years old at the time of his testimony on November 19, 2019. R. at 55. At his hearing before the ALJ, Plaintiff testified that he lived in Puerto Rico until he was 17 years old when he and his family moved to New York. R. at 59. Plaintiff completed the 11th grade and was in special education for a period of time. R. at 58. Plaintiff did not attend school in New York and began working soon after moving. R. at 59. He last worked in 2001 as a spray painter for window treatments prior to his arrest. R. at 62-63.

Plaintiff has lived in Project Renewal transitional housing since his release from prison on June 5, 2018. R. at 55. He lives on the third floor of an apartment building without an elevator. *Id*. He lives with two roommates who were also previously in prison. R. at 56. Plaintiff's roommates help him shop and learn other skills. *Id*. Plaintiff's neighbor occasionally helps him do laundry at a location close to his apartment. R. at 60. Plaintiff testified that Project Renewal will help him find his own apartment once they believe he is ready. R. at 56. To meet the requirements of his parole and to continue living in Project Renewal housing, Plaintiff must attend mental health appointments and pass periodic drug tests. R. at 58. Plaintiff has remained compliant with all requirements. *Id*. He meets with his parole officer every two to three weeks. R. at 57.

Plaintiff testified that he is prescribed Naprosyn and Motrin for his back pain, but he cannot take any medication stronger than that due to his parole guidelines. R. at 65. Plaintiff testified that he takes between 18 and 20 medications every day for his various ailments. R. at 75. The medications are brought to his apartment weekly by Project Renewal staff. R. at 72. He

reported that the medication makes him tired, but it controls his hallucinations and other symptoms of depression effectively. R. at 75.

## IV.     Plaintiff's Function Report

In an April 2018 Function Report, Plaintiff reported that his daily activities include cooking, attending Project Renewal appointments, cleaning, listening to music, lifting weights, going to church, and spending time with family. R. at 306-10. He reported that his conditions do not affect his ability to lift, stand, walk, or sit. R. at 311-12. He also reported that he can follow instructions but has had difficulty getting along with authority and adapting to change in the past. R. at 311.

## V.     Vocational Expert's Testimony

Vocational Expert Lisa Gagliano testified in response to the ALJ's various hypotheticals about employment for an individual of Plaintiff's age, education, and past work experience at different levels of functional capacity. R. at 82-83. The first hypothetical person did not have any exertional limitations and could understand and carry out simple instructions in a low stress job, which is defined as having occasional changes in the work setting and occasional decision making. R. at 81. Based on this hypothetical, the VE provided possible titles from the Dictionary of Occupational Titles: Institutional Cleaner, DOT No. 381.687-014, with 309,000 positions; Laundry Laborer, DOT No. 361.687-018, with 57,000 positions; and Factory Helper, DOT No. 529.686-034, with 21,000 positions. *Id*.

The second hypothetical person could not perform fast-paced work, but could perform goal-oriented work that can be completed by the end of the work shift. *Id*. This person could also have occasional interaction with others. *Id*. The VE determined that the second hypothetical

person would be precluded from the Factory Helper position, but the Laundry Laborer and Institutional Cleaner positions remain. R. at 82.

The third hypothetical person could have occasional brief and superficial interaction with co-workers, but they could neither engage in tandem activities or interact with the general public. *Id*. The VE determined that the Laundry Laborer and Institutional Cleaner positions remain. *Id*.

The fourth hypothetical person could lift and carry 20 lbs. occasionally and 10 lbs. frequently; sit for 6 hours; stand or walk for 6 hours; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; stoop, crouch, kneel, crawl, and balance; have occasional exposure to respiratory irritants, wetness, humidity, and extreme cold; and could frequently push or pull. *Id*. The VE determined that the following positions would be available for the fourth hypothetical person: Routing Clerk, DOT No. 222.687-022, with 56,000 positions; Garment Sorter, DOT No. 222.687-014, with 19,000 positions; and Housekeeping Cleaner, DOT No. 323.687-014, with 61,000 positions. R. at 82-83.

The fifth hypothetical person was further limited to being able to lift and carry 10 lbs. occasionally and small docket files frequently, and to stand or walk for two hours. R. at 83. The VE identified the position of Touch-up Screener, DOT No. 726.684-110, with 17,000 positions. *Id*. The VE also testified that an individual who is off-task for more than 10% of the time or who is absent two days per month would be precluded from jobs in the competitive market. *Id*.

In response to Plaintiff's counsel, the VE also testified that the hypothetical individual would be precluded from employment if he had a moderate loss in the ability to remember locations and work-like procedures; understand and remember very short, simple instructions; maintain regular attendance and be punctual; make simple work-like decisions; ask simple questions; maintain socially appropriate behavior; adhere to basic standards of neatness and

cleanliness; and be aware of normal hazards and take appropriate precautions against them. R. at 84-85.

## VI.    The ALJ's Decision

Applying the five-step sequential evaluation for adjudicating Social Security disability claims, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since January 31, 2002, the alleged onset date. R. at 20.

At step two, the ALJ found that Plaintiff had the following severe impairments: Major Depressive Disorder with a history of psychotic features and Borderline Personality Disorder R. at 21. The ALJ found that Plaintiff's medical history was insufficient to establish medically determinable impairments connected to his back pain and hearing loss because the record lacks objective evidence or diagnostic testing, relying instead on subjective complaints. R. at 22. The ALJ also found that Plaintiff's obesity, asthma, diabetes, hypertension, mixed hyperlipidemia, GERD, lipoma of right abdomen/hip, and bronchitis are all stable and controlled with treatment, and thus, are not severe. R. at 23.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). R. at 24. The ALJ found that Plaintiff has mild limitations in his ability to interact with others and in his ability to understand, remember, or apply information. R. at 24-25. The ALJ also found that Plaintiff has moderate limitations in his ability to concentrate, persist, or maintain pace and in his ability to adapt or manage himself. R. at 25-26.

At step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations:

he can understand and carry out simple and routine instructions in a low-stress job, which is defined as having occasional changes in the work setting and occasional decision making. R. at 26. In making this determination, the ALJ considered whether there is an underlying medically determinable impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, as well as the intensity, persistence, and limiting effects of such pain or symptoms on work-related activities. R. at 26-27. The ALJ stated that the VE's testimony indicated that Plaintiff was unable to perform any past relevant work. R. at 36.

At step five, the ALJ considered Plaintiff's age, education, work experience, and RFC, as well as the VE's testimony and the Medical-Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2. R. at 37. The ALJ concluded that there were a significant number of jobs in the national economy that Plaintiff could perform. *Id*. The ALJ therefore found that Plaintiff was not disabled within the meaning of the Act. *Id*.

## STANDARD OF REVIEW

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (internal quotation marks omitted). In other words,

this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted).

## I.   Definition of Disability

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

## II.   Commissioner's Five-Step Analysis of Disability Claims

The Commissioner uses a five-step process to determine whether a claimant has a disability within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4). "If the Commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (internal quotations omitted).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four." *Id*. at 128 (internal citations omitted). At step five, however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560), *amended on reh'g*, 416 F.3d 101 (2d Cir. 2005); *see also* 20 C.F.R. § 404.1520(a)(4)(v).

## DISCUSSION

Plaintiff argues that the ALJ failed to (1) develop the record, (2) properly consider Dr. Halligan-McCaleb's assessment, (3) properly accommodate Plaintiff's nonexertional limitations, and (4) properly consider his physical conditions. Pl. Mot. at 15, 21, 23, 25. The Court concludes that the ALJ's decision was supported by substantial evidence upon consideration of each of those factors.

### I.   The ALJ Fulfilled Her Duty to Develop the Record

Unlike a judge in a trial, the social security ALJ must affirmatively develop the record in light of the non-adversarial nature of a benefits proceeding, even when a claimant is represented by counsel. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). While the ALJ must supplement the record through her own initiative when the record is incomplete or inadequate, this burden does not attach when the record is ample. *Valoy v. Barnhart*, No. 02 Civ. 8955, 2004 U.S. Dist. LEXIS 3672, 2004 WL 439424, at *7 (S.D.N.Y. Mar. 9, 2004). Where the ALJ does have an obligation to develop the record, however, she may satisfy this duty "by relying on the claimant's counsel to obtain additional medical documentation." *Myers ex rel. C.N. v. Astrue*,

993 F. Supp. 2d 156, 163 (N.D.N.Y. 2012); *see also Jordan v. Comm'r of Soc. Sec.*, 142 Fed.

App'x 542, 543 (2d Cir. Sept. 8, 2005) (ALJ "fulfilled his duty to develop the administrative

record" where plaintiff's counsel indicated during the hearing that he would obtain missing

records; ALJ held the record open to allow him to do so; and counsel did not request the ALJ's

assistance in obtaining the evidence).

Plaintiff asserts that the ALJ failed to discharge her duty to further develop the record,

particularly in regards to Dr. Halligan-McCaleb's assessment. Pl. Mot. at 19. Plaintiff claims that

the ALJ found Dr. Halligan-McCaleb's assessment "minimally persuasive" due to the record's

lack of treatment notes, and thus, the ALJ had a duty to request additional medical evidence from

Dr. Halligan-McCaleb. Pl. Mot. at 19. The ALJ's decision, however, cited the lack of treatment

notes, not as substantive evidence about the Plaintiff's impairments, but "as a marker that she

considered the evidence she had before her." *See Clayton v. Colvin*, 99 F. Supp. 3d 269, 277

(N.D.N.Y. 2015). Regardless, the ALJ provided multiple opportunities to obtain additional

evidence.

On June 11, 2019 and again on August 14, 2019, Plaintiff received a letter informing him

of his right to request a subpoena if a witness is uncooperative in producing relevant evidence. R.

at 163. Hearing testimony also shows that the ALJ told Plaintiff that she would keep the record

open after the hearing to allow for additional time to obtain (1) medical records from Sing Sing

Correctional Facility, (2) the results of an MRI that Plaintiff received at Lincoln Hospital, and (3)

records from New Beginnings. R. at 50, 67. Since Dr. Halligan-McCaleb was Plaintiff's

psychiatrist at New Beginnings, her treatment notes presumably would have been included in the

additional evidence. On December 3, 2019, after holding the record open for three weeks with no

communication from Plaintiff's counsel, the ALJ informed Plaintiff's counsel that she would

15

keep the record open for an additional ten days but would close it if she did not receive additional evidence or a request for more time within that time frame. R. at 220. On December 10, 2019, Plaintiff's counsel requested an additional two weeks to obtain medical records from Sing Sing Correctional Facility but stated that the evidence from New Beginnings had already been submitted prior to the hearing. R. at 326. The only additional evidence that Plaintiff provided after the hearing was an evaluation by neurosurgeon Amed Rawanduzy in which he recommended the MRI at Lincoln Hospital. R. at 749-52. Dr. Rawanduzy's report did not include the results of the MRI. *Id*.

The Court concludes that the ALJ fulfilled her duty to develop the record by allowing Plaintiff's counsel to submit additional evidence for a month after the hearing. *Jordan*, 142 Fed. App'x at 543.

## II. The ALJ Properly Considered Dr. Halligan-McCaleb's Assessment

Plaintiff argues that the ALJ erred in finding Dr. Halligan-McCaleb's assessment unpersuasive and in favoring the opinions of consultative examiners Dr. Broska and Dr. Walker. Pl. Mot. at 19-20. Plaintiff further asserts that Dr. Halligan-McCaleb's assessment is supported by Dr. Gutierrez's April 2018 letter, Dr. Middleton's June 2018 evaluation, and Plaintiff's need for transitional housing. Pl. Mot. at 20-21. Plaintiff claims that the ALJ improperly weighed the medical opinions on the record. *Id*. at 16. The Court disagrees with Plaintiff's assertions.

Under the new regulations for claims filed after March 27, 2017, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). "The regulations explain that when 'evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings,' the 'most important factors . . . are supportability . . . and

consistency.'" *Loucks v. Kijakazi*, No. 21-1749, 2022 U.S. App. LEXIS 16829, at *3 (2d Cir.

June 17, 2022) (quoting 20 C.F.R. § 404.1520c(a)). The ALJ must explain how she considered

the supportability and consistency factors in her decision, and may, but is not required to explain

her consideration of the medical source's specialization, relationship with the claimant, or other

factors. *Id.* (citing 20 C.F.R. § 404.1520c(b)(2)). As long as the ALJ's findings are supported by

substantial evidence, the "deferential standard of review prevents us from reweighing" them.

*Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016).

      Here, the ALJ provides substantial evidence for her consideration of Dr. Halligan-

McCaleb's assessment. R. at 35. Dr. Halligan-McCaleb reported signs and symptoms of: poor

memory; appetite disturbance with weight change; sleep disturbance; mood disturbance;

paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or

concentrating; suicidal ideation or attempts; social withdrawal or isolation; decreased energy;

obsessions or compulsions; intrusive recollections of a traumatic experience; persistent irrational

fears; generalized persistent anxiety; and borderline personality disorder. R. at 675.

      The ALJ noted that nearly all of the symptoms listed were unsupported by other

psychiatric evidence, including Dr. Gutierrez's letter, Dr. Middleton's evaluation, Dr. Broska's

evaluation, and treatment notes from Project Renewal physicians at the time. R. at 34.

      Dr. Halligan-McCaleb also indicated that Plaintiff had moderate limitations in activities

of daily living, marked limitations in maintaining social functioning, and frequent deficiencies in

concentration, persistence, or pace. R. at 678. The ALJ found that the degree of limitation found

is contradicted by other evidence on the record and Plaintiff's description of his daily activities

and symptoms. R. at 34. Progress notes from the years leading up to Plaintiff's release from

prison show that he has remained stable on medication since 2012. R. at 593-622. From June

2018 to July 2019, Plaintiff reported no symptoms during depression screenings conducted by Project Renewal primary care physicians. R. at 652, 655, 658. On July 24, 2019, Plaintiff even reported doing "very well" and going to church every day. R. at 658.

Plaintiff points to the psychiatric history included in Drs. Gutierrez, Middleton, and Broska's reports and argues that "there is no evidence to suggest that [his] condition has improved." Pl. Mot. at 19. Plaintiff's assertion fails to acknowledge that each of these sources also noted Plaintiff's adequate demeanor and behavior, as well as his lack of psychiatric symptoms since 2012. R. at 630, 670, 643.

The Court concludes that the ALJ's consideration of Dr. Halligan-McCaleb's assessment is supported by substantial evidence and that the ALJ adequately explained the assessment's lack of "supportability and consistency" with other evidence on the record. *Krull*, 669 F. App'x at 32.

## III.     The ALJ Properly Considered Plaintiff's Limitations in the RFC

The RFC determination is "the most [a claimant] can still do despite his limitations," and is based upon all the relevant evidence in the case record. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p. Plaintiff bears the burden of proving that his RFC is more restrictive than that found by the ALJ. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). The ALJ's RFC determination must "afford an adequate basis for meaningful judicial review, apply the proper legal standards, and be supported by substantial evidence such that additional analysis would be unnecessary or superfluous," as here. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (internal quotation marks and brackets omitted).

The ALJ found a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, and maintaining pace; and a moderate limitation in adapting or managing oneself. R.

at 24-26. Plaintiff does not dispute the ALJ's finding that Plaintiff had only mild to moderate nonexertional limitations. Rather, Plaintiff asserts that the ALJ failed to accommodate these limitations in her determination that Plaintiff can understand and carry out simple and routine instructions in a low-stress, unskilled job. Pl. Mot. at 21-23. The Court disagrees.

"The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15. The ALJ used substantial evidence to support her RFC determination, considering Plaintiff's testimony about his daily living, Dr. Broska's evaluation, and Dr. Walker's report. R. at 35-36. The ALJ then properly relied on the VE's testimony to determine that limiting Plaintiff to unskilled work with the given limitations adequately accommodates his RFC. *McIntyre*, 758 F.3d at 152 (finding that the ALJ's hypotheticals including only unskilled work implicitly accounted for the plaintiff's mental limitations). The ALJ met her burden of showing substantial evidence in support of her RFC determination. *Id*. If Plaintiff believes that his RFC is more restrictive than the ALJ's determination, the burden is his to provide evidence of further limitations. *Poupore*, 566 F.3d at 306. Instead, he argues that there is no evidence of his ability to perform simple tasks on a sustained basis. Pl. Mot. at 22. But there is ample evidence that Plaintiff could perform simple tasks like cleaning, attending appointments, and doing laundry. R. at 306-10. *Poupore*, 566 F.3d at 306.

Because the ALJ's finding that Plaintiff had the RFC to understand and carry out simple and routine instructions in a low-stress, unskilled job is supported by substantial evidence, the Court defers to her decision.

**IV.      The ALJ Properly Considered Plaintiff's Physical Conditions**

Plaintiff asserts that the ALJ failed to consider the following non-severe impairments in her RFC determination: obesity, asthma, diabetes, hypertension, mixed hyperlipidemia, GERD, lipoma of right abdomen/hip, and bronchitis. Pl. Mot. at 23.

An impairment or combination of impairments is severe if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1522, 416.922. SSR 85-28. SSR 16-3p. An impairment or combination of impairments is not severe when evidence establishes only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. SSR 85-28. Moreover, to be severe, an impairment must last or be expected to last at a "severe" level for a continuous period of twelve months. 20 C.F.R. §§ 404.1509, 416.909.

The ALJ explained that because Plaintiff's conditions are stable and controlled with treatment, they do not create any exertional limitations, and thus are not severe. R. at 23 (citing R. at 97 (Dr. Miller's finding that Plaintiff's diagnoses were without complication)). The ALJ's assertion is well-supported by substantial evidence, including Dr. Kaplan's July 2019 report that Plaintiff was doing "very well," as well as a lack of hospitalizations or aggressive treatment. R. at 23. *See e.g., Burgess*, 537 F.3d at 129 (finding that conservative treatment using over-the-counter medications may support the conclusion that the claimant is not disabled if accompanied by other substantial evidence). The ALJ also noted that Plaintiff had lost weight and had an improved BMI since his release from prison, which does not support a finding of "severity" for the required time duration. R. at 23. §§ 404.1509, 416.909.

The ALJ also determined that Plaintiff's asthma was not severe despite complaints of "severe persistent asthma," because an April 2019 exam showed his lungs were clear to

auscultation bilaterally with no wheezes, rhonchi, or rales. R. at 23. SSR 85-28 (an impairment is not severe when evidence establishes no abnormalities or only slight abnormalities). Plaintiff's primary care physician prescribed a new inhaler in April, and in July 2019, Plaintiff indicated that he was doing very well, that he had stopped smoking, and that he was exercising several times a week. R. at 23. Plaintiff showed no evidence to establish that his conditions created significant limitations on his ability to do work-related activities. *Poupore*, 566 F.3d at 306.

Because the ALJ's characterization of Plaintiff's impairments as "non-severe" is supported by substantial evidence, the Court concludes that the ALJ properly excluded exertional limitations from Plaintiff's RFC.

Plaintiff also argues that the ALJ erred in finding that his back and shoulder pain were not medically determinable impairments. Pl. Mot. at 24. The Court disagrees.

Plaintiff's argument relies on Dr. Kaplan's medical source statement indicating extreme exertional limitations due to diagnosed back pain. *Id*. As the ALJ explained, pain is merely a symptom. R. at 23. Medically acceptable clinical or laboratory diagnostic techniques showing a medical impairment that could reasonably cause the alleged symptoms could support a finding of exertional limitations, but symptoms alone do not. SSR 16-3p. Moreover, the ALJ is free to determine the persuasiveness of evidence on the record so long as she considers its supportability and consistency. *Loucks*, No. 21-1749, 2022 U.S. App. LEXIS at *3.

There is no clinical or laboratory evidence to show a medically determinable impairment to support Dr. Kaplan's assertions, and in fact, the extreme limitations Dr. Kaplan reported are directly contradicted by his own treatment notes that showed consistently unremarkable physical examinations. R. at 697. Dr. Kaplan's February 2019 treatment notes also show that Plaintiff reported that his back pain had returned only after stopping the medication prescribed to him

while incarcerated. *Id*. After the February 2019 appointment, there is no record of additional complaints of back pain. Additionally, the ALJ points to Plaintiff's normal lumbar x-ray at Dr. Fkiaras' examination as evidence of a lack of a medically determinable impairment. R. at 33. The ALJ also found that Plaintiff's Function Report contradicts Dr. Kaplan's extreme limitations given that Plaintiff stated that his conditions have no effect on his ability to lift, stand, walk, sit, climb, kneel, squat, or reach. R. at 311. Plaintiff's daily activities, including weight lifting also directly contradict Dr. Kaplan's medical source statement. *Id*.

For the reasons set forth, the ALJ concluded that Dr. Kaplan's assessment is unpersuasive. Because the ALJ's determination is supported by substantial evidence, the Court concludes that she properly considered Plaintiff's physical conditions in finding that Plaintiff does not have any exertional limitations.

Overall, the ALJ provided substantial evidence and adequate explanations for her decision. Plaintiff's objections are directed at the ALJ's weighing of the evidence, but Plaintiff has not shown that the ALJ acted unreasonably in evaluating the persuasiveness of medical evidence on the record. The deferential standard of review requires this Court to uphold the ALJ's properly supported findings. *Krull*, 669 F. App'x at 32.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is GRANTED, Plaintiff's motion for judgment on the pleadings is DENIED, and the ALJ's decision is AFFIRMED. The Clerk of the Court is respectfully directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated:**      **New York, New York**
             **August 22, 2022**

_____

             **ANDREW L. CARTER, JR.**
             **United States District Judge**